HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KEITH L. NASH,<br><br>                Plaintiff,<br><br>     v.<br><br>VANCOUVER POLICE DEPARTMENT, CLIFFORD R. COOK, OFFICER JOHN DOES, OFFICER JANE DOES ,<br><br>                Defendants. | No.   C10-5055RBL<br><br>ORDER ON SUMMARY JUDGMENT [Dkt. #12] |

THIS MATTER is before the court on Defendants' Motion for Summary Judgment. [Dkt # 12]. The case arises from the investigatory *Terry* stop of Plaintiff Keith Nash on October 27, 2008 during the search for an armed burglary suspect seen in Plaintiff's vicinity and sharing certain physical characteristics with Plaintiff. Plaintiff was not armed and was not the subject of the search.

Before confirming that Mr. Nash was not the burglary suspect and leaving to continue the search, Vancouver Police Department (VPD) officers physically restrained him at gunpoint, searched him for weapons, and checked his ID with dispatch. Shortly after the stop, Plaintiff suffered an anxiety attack and fell to the ground, bruising his face.

On November 3, 2008, Plaintiff filed an internal affairs complaint with the VPD, alleging that he had been unlawfully subjected to racial discrimination, harassment, and bodily

Order - 1

injury. [Dkt. #13, Libbey Dec.]. An investigation failed to produce evidence that any VPD officer acted in a way that was unfair or discriminatory so as to violate VPD Policy 470- Preventing Biased Policing. The investigation instead confirmed that the officers acted reasonably given the circumstances and had left by the time Plaintiff fell. Accordingly, Plaintiff's complaint was denied and no officers were punished.

Mr. Nash sues under 42 U.S.C. § 1983 for violations of his federally protected constitutional rights, alleging that he was subjected to an unreasonable and excessively forceful search and seizure, discriminated against and denied equal protection of the laws on the basis of his race and status as a convicted sex offender, and denied due process. Defendants are the VPD, Chief of the VPD Clifford R. Cook, and the various officers and other VPD officials involved with the stop and the subsequent internal affairs investigation (originally named as John and Jane Does). [Dkt. #4, Civil Rights Complaint].

The moving Defendants, Chief Cook and the City of Vancouver[1], seek summary dismissal of all of Plaintiff's claims, arguing that the stop of Mr. Nash was a justified *Terry* stop; that even if Plaintiff were given an "unimpartial" investigation because of his status as a convicted sex offender, which the evidence does not support, this was rationally justified by his felon status; that there is no constitutional right to obtain officers' information; that no actions by any Defendant constituted a violation of Plaintiff's right to substantive due process; and that, in any event, Defendants are entitled to qualified immunity.

For the reasons that follow, Defendants' Motion is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

**I.     FACTS**

Most of this factual background is taken from the CAD (computer-aided dispatch) report and transcript of radio traffic from October 27, 2008 [Dkt. #13, Libbey Dec.], which the Ninth Circuit has deemed to "accurately" record the times at which the various events occurred. *Long v. City and County of Honolulu*, 511 F.3d 901, 904 (9th Cir. 2007).

---

[1] The VPD is an entity of the City of Vancouver.

At 11:01 a.m. the Vancouver Police Department was alerted to a burglary suspect at 3712 R Street, described as a "black male, lighter skin, 13 to 14 years of age, dark blue baseball cap off to the side with a puffy coat, possibly multi-color or dark." [Libbey Dec., Dkt. #13, at Ex. 4]. At 11:02 a.m., VPD Officer Ryan Demmon spotted the subject, identifying him as a "black male" who was "hopping fences". *Id*. Shortly after, a citizen called in describing a "light skinned…black male" with a "black handgun in his hand" who "appeared to chamber a round in a semi-auto gun." *Id*. At the same time, the prowler was re-described as a "black male about 5'06", 5'07", thin build," who was wearing "a black puffy parka, maybe some white design, and blue jeans." *Id.* The manhunt continued without success, resulting in orders to lockdown two local elementary schools.

At 11:26 a.m., Code Officer Dan Jones, a retired VPD officer, notified dispatch that on his way to lunch he had spotted "a black guy in a black hoody and jeans standing about the 4000 block of NE St. Johns Road., looking real nervous." *Id*. Jones told dispatch that the man was standing at a bus stop talking on his phone, and again described him as a "black male, [who] has a dark sweatshirt with a hoody, and it looks like he's got dark…pants like dark jeans." *Id*. According to Jones, this individual, Plaintiff Keith Nash, "look[ed] just like who they were telling me to look for" and "[would have] had plenty of time" to get to his location given the preceding time and location that the prowler had been spotted. *Id*. at Ex. 7.

At 11:32 a.m. Clark County Deputy Sheriff Alan Earhart made visual contact with Mr. Nash, reporting "he looks like he's probably about 25." *Id*. at Ex. 4. Earhart was the first to arrive on the scene, immediately followed by VPD Sergeant Dave Henderson and Officer Frank Gomez, and subsequently by more VPD officers. Gomez and the ensuing officers kept their distance, as Henderson and Earhart were the only ones to make physical or verbal contact with Mr. Nash. Deputy Earhart asked Mr. Nash from a distance if he had any weapons, asked him to lift up his shirt to confirm that he was unarmed, and said "I'm going to pat you down." *Id*. at Ex. 8. Mr. Nash was compliant, and Sgt. Henderson restrained him from behind by holding his hands to the back of his neck as Earhart patted him down, checked his book bag, socks, and pockets for weapons, and took his wallet with ID to confirm his identity. During his

interview for the ensuing VPD internal affairs investigation, Plaintiff testified that he requested Earhart check his ID to confirm his innocence. *See Id.* at Ex. 6.

At 11:34 a.m., after obtaining Plaintiff's ID, Earhart radioed dispatch to confirm Mr. Nash's identity. Dispatch responded at 11:35 a.m., saying Mr. Nash had "no wants" but was a "sex offender." *Id.* at Ex. 4. Plaintiff was never handcuffed, and while it is clear that at least two officers initially drew their guns, Mr. Nash's testimony that "during the whole thing there was a lot of guns pointed at me" is contradicted by all Defendants. *Id.* at Ex. 6-12.  All officers[2] who were at the scene agree that no guns were pointed at Plaintiff, and Mr. Nash admits that any drawn guns were re-holstered or put away upon confirming that he was not the armed burglary suspect. Upon verifying Mr. Nash's identity, the officers immediately dispersed to resume the search for the burglary suspect. Plaintiff testified that as the officers were leaving he asked for their names and badge numbers, but was ignored and/or refused. All officers testify that they did not hear Mr. Nash's request for their information. By 11:38 a.m. all officers were gone.

After the officers had left, Mr. Nash began feeling ill with an anxiety attack and fell, mildly bruising his face on the sidewalk. None of the officers saw him fall, as they had already departed to resume the manhunt.

Plaintiff filed an internal affairs complaint with the VPD on November 3, 2008, alleging that he suffered "racial discrimination/harassment/and bodily injury," and that the officers acted improperly by "failing to provide me with there [sic] names and employment as I requested." *Id.* at Ex. 1. Sergeant Deborah Libbey of the VPD Professional Standards Unit (PSU) conducted the investigation, interviewing Mr. Nash and all officers who were at the scene. The complaint was investigated as an alleged violation of VPR Policy § 470 which prohibits "biased policing," or "[a]ny police initiated action that relies *solely* on the race, ethnicity, age, gender or national origin of a person." [Delgado Dec., Dkt. #14, at Ex. 1 (emphasis in original)]. Commander George Delgado reviewed the investigative file compiled by Sergeant Libbey and determined that Plaintiff's complaint was unfounded, as there was no evidence of

---

[2] "Officers" refers to all law enforcement officials listed as Defendants in Plaintiff's Proposed Amended Complaint [Dkt. #18] who were at the scene of the stop, including Sergeant Henderson and Deputy Earhart.

Order - 4

any VPD officer acting in an unfair or discriminatory way because of Mr. Nash's race, age, national origin, or any other reason. Delgado instead found the officers' actions to be reasonable in the circumstances and that by the time Mr. Nash fell, all officers had left. Accordingly, the complaint was denied, and no officers were punished. Chief Clifford Cook approved the denial of Plaintiff's complaint. Throughout the investigation, review, and approval, Plaintiff was not provided with the officers' names or badge numbers, and was not told whether any additional officers were at the scene of the stop.

Plaintiff, who is incarcerated, filed his civil complaint pro se and *in forma pauperis* on February 8, 2010, alleging violations of his federally protected constitutional rights under 42 U.S.C. § 1983. Specifically, he claims that Defendants conducted an unreasonable search and seizure using excessive force in violation of his Fourth Amendment rights, denied him due process in violation of his Fifth Amendment rights, and discriminated against him, both on the basis of his race when they stopped him and on the basis of his sex offender status when he was given an "unimpartial investigation," in violation of his Fourteenth Amendment rights[3]. [Dkt. #18, Proposed Amended Complaint]. Defendants filed their Motion for Summary Judgment [Dkt. #12] on March 29, 2010 along with Commander Delgado's Declaration [Dkt. #13] including a copy of VPD Policy 470, as well as Sergeant Libbey's Declaration [Dkt. #14] including the CAD report, radio transcripts, all investigative interviews, and a photo of Mr. Nash. On the same day, Plaintiff filed a Request for Alternative Dispute Resolution. [Dkt. #15]. On April 8, 2010, Plaintiff filed motions to "Strike" Defendant's Motion for Summary Judgment [Dkt. #17] under Federal Rule of Civil Procedure 12(f), or in the alternative for a 60 day extension to file a response to the motion, and for Leave to Amend his Complaint [Dkt. #18] under Rule 15(a), with which he included a Proposed Amended Complaint.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary

---

[3] He also alleges violations of his First and Eighth Amendment rights, but these claims are either dropped or incorporated into his other constitutional claims. *See* § II(B) of this order.

Order - 5

judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B.   Interpreting Plaintiff's Claims and Motions**

Because Plaintiff brings his case pro se, his pleadings and motions must be construed liberally. *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987). In other words, focus should not be placed on technical missteps and specific wording of Plaintiff's litigation documents, but on the merits themselves. Plaintiff has not filed a formal "response" to Defendants' Motion for Summary Judgment, i.e. affidavits or other evidence showing a genuine issue of material fact in accordance with Rule 56 and this Court's directions. [*See* Dkt. #3, Order Granting Plaintiff's Application to Proceed *in Forma Pauperis*]. However, his motions to "strike" the summary judgment motion under Rule 12(f) and for leave to amend his complaint under Rule 15(a) shall be loosely construed and deemed responses to Defendants' summary judgment motion. So, for the purposes of this analysis, the facts and causes of action laid out in Mr. Nash's Proposed Amended Complaint [Dkt. #18] and Motion to Strike [Dkt. #17] will be regarded as evidence and viewed in the light most favorable to him. If under this lenient standard his claims are meritless, then his Amended Complaint is futile[4], *see Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991), and his motion to strike Defendants' Motion for Summary Judgment is moot[5].

---

[4] Essentially, Plaintiff's Proposed Amended Complaint is accepted as his complaint.

[5] Plaintiff's "Motion to Strike" under Rule 12(f), construed liberally, may be taken a request that the Court deny Defendants' Motion for Summary Judgment and grant him leave to amend his complaint, yet his

Mr. Nash originally claimed infringement of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment constitutional rights. In his Proposed Amended Complaint [Dkt. #18], he drops the First Amendment claim, which was completely unfounded. The Eighth Amendment claim clearly has no merit either because a state cannot "punish" until after a formal adjudication of guilt. *Ingraham v. Wright*, 430 U.S. 651, 657 (1977). He claims that his Eighth Amendment rights were violated when the officers used excessive force against him during the investigatory stop, rendering their actions undertaken with "deliberate indifference." [*See* Dkt. #18]. However, this is actually a Fourth Amendment claim in the context of an investigatory search and seizure. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 388 (1986). Thus, construing Plaintiff's allegations liberally, his numerous and scattered constitutional claims can be condensed to allege violations of his Fourth Amendment right to be free from unreasonable searches and seizures, particularly those involving excessive force, his Fifth Amendment right to due process, and his Fourteenth Amendment right to equal protection of the laws.

In Plaintiff's Proposed Amended Complaint, he enumerates eight VPD officials, six who were at the stop[6] and two who conducted the investigation, in place of the original John and Jane Does. He drops the VPD as a Defendant, but keeps Chief Cook. Plaintiff's claims are based solely on violations of his constitutional rights. Accordingly, if it is determined that none of his constitutional rights have been violated, then summary judgment shall be entered for Defendants. This analysis need not raise issues of qualified immunity, respondeat superior, or other forms of immunity or vicarious liability because if Mr. Nash's constitutional rights have not been violated, his claims will fail regardless of who he lists as defendants.

**C.     Fourth Amendment Claims**

Plaintiff claims that Defendants violated his Fourth Amendment right to be free from "unreasonable searches and seizures," U.S. Const. amend. IV, by suspecting him to be the

---

Proposed Amended Complaint is already accepted as evidence. It can also be construed as a request to continue the summary judgment under Rule 56(f), but "[a] party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006). Plaintiff has not complied with these Rule 56(f) requirements, and all facts and allegations in his filed documents are already accepted as evidence.

[6] One of the six listed officers at the stop, Officer Deputy Earhart, was actually a Clark County Deputy, not a part of the VPD.

burglary suspect, searching his pockets, socks, and book bag for weapons, and using excessive force during the investigatory stop. Defendants contend that they conducted a valid *Terry* stop. There is no dispute that Plaintiff was seized for the purposes of Fourth Amendment analysis [*see* Motion for Summary Judgment, Dkt. #12, at 9], and it is clear that he was searched as well when Earhart frisked him and checked him for weapons. However, "'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 346 U.S. 206, 222 (1960)).

The Supreme Court "has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004)(citing *INS v. Delgado,* 466 U.S. 210, 216 (1984)). However, "[a] search for weapons in the absence of probable cause to arrest [] must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 25-26 (citing *Warden v. Hayden*, 387 U.S. 294, 310 (1967)). Thus, in the context of a non-arrest seizure and search for weapons, the "reasonable" standard enumerated in the Fourth Amendment and most often cited from *Terry* can be broken down into (1) the reasonableness of suspecting the individual and (2) the reasonableness of the interaction with that individual.

### 1. Reasonable Suspicion

Officers need not be reasonably certain that one is their subject to conduct a valid *Terry* stop, but only need to be reasonably suspicious. *See, e.g*., *Hiibel,* 542 U.S. at 185. As articulated by the Supreme Court, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972). In other words, in determining whether reasonable suspicion exists to justify a brief investigatory detention, this court will consider "the totality of the circumstances." *U.S. v. Osborn*, 203 F.3d 1176, 1181 (9th Cir. 2000)(internal citations omitted). Reasonable suspicion can arise from information different in quality and

content and even less reliable than that required for the establishment of probable cause. *See U.S. v. Sokolov*, 490 U.S. 1, 7 (1989).

Here, suspecting Mr. Nash to be the armed burglary suspect was reasonable as a matter of law. The evidence clearly shows that Mr. Nash was dressed in similar attire as the suspect[7], was of the same race as the suspect, and was well within the travel radius that the suspect could have reached. He was observed as acting "nervously" while waiting at a bus stop, presumably trying to get far away from the manhunt that was making him feel nervous. Plaintiff's appearance along with the description of the suspect available at that time led Code Officer Jones to believe that Plaintiff "look[ed] just like who they were telling me to look for." [Libbey Dec., Dkt. #13, at Ex. 7].

In opposition, Plaintiff argues that the suspect was described as being a "light skinned" black male who was in his early to mid teens, whereas Mr. Nash is a darker-skinned black man in his 30s. *See Id.* at Ex. 13. While Plaintiff's points are valid, they do not render the seizure unreasonable so as to constitute a Fourth Amendment violation. The sightings of the armed suspect were all brief and from a distance, as he was running from the police and hopping fences. He was wearing a coat, long pants, and a baseball cap, meaning any view of his actual person was only his face (under a baseball cap), his neck, and his hands. These circumstances would make an accurate judgment of his age and skin tone difficult. As Sergeants Libbey and Henderson explain, witness identifications are often unclear and less than 100% accurate, especially when describing subjective traits such as the "darkness" of one's skin. *Id.* at ¶ 7, Ex. 9. One's apparent age is subjective as well, and it has been repeatedly noted that Mr. Nash, while over 30, looks young for his age. *See Id.* at Ex. 6, Ex. 4, Ex. 13.

Sgt. Henderson testified that although he was skeptical that Mr. Nash was the suspect, it was still appropriate to briefly stop him. *Id.* at Ex. 9. Given the futility of the manhunt up to the that point, the shared characteristics between Mr. Nash and the suspect's description, and the subjectivity of the distinguishing characteristics, Sgt. Henderson found it reasonable and justified to at least check and make sure Mr. Nash was not their target. *Id.*

---

[7] Not only was their attire similar in color and style, but they were both wearing outfits that covered almost their entire bodies, rendering attire a very strong and relevant factor in suspecting Plaintiff.

While the officers' suspicion of Plaintiff may not have been strong enough to provide probable cause for an arrest, it was certainly reasonable given the information available to them at that time and the surrounding circumstances, as viewed in the light most favorable to the Plaintiff. Thus, the decision to make the *Terry* stop was justified as a matter of law.

### 2. Reasonable Interactions

"The Supreme Court has permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety; a police officer may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." *U.S. v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990)(citing *Terry*, 392 U.S. at 24). "So long as the officer…has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [a] protective purpose." *Adams*, 407 U.S. at 146. "*Terry* does not in terms limit a weapons search to a so-called 'pat down' search. Any limited intrusion designed to discover guns, knives, clubs or other instruments of assault are permissible." *U.S. v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976).

Here, the brief detainment, search, and limited use of force were reasonable as a matter of law. The underlying reason for the aggressive police manhunt was the reported existence of an armed burglary suspect roaming the area. Witness reports that the suspect was carrying a gun and had loaded it were the driving force behind the frantic search, as well as the lockdown of two schools. So, when approaching an individual suspected of being the search target, it was completely reasonable for the officers to assume that he was carrying a loaded gun, as this was their reason for stopping him. Accordingly, the officers pointing guns to ensure self-protection, asking Mr. Nash to lift his shirt and show his waistband, patting him down, holding his hands in place[8], and searching his pockets, socks, and book bag were all necessary and tailored to ensuring that he did not harm the officers or others.

Having him raise his shirt, frisking him, and searching his bag were measures clearly taken to ensure he was not carrying a gun. It is true that searching inside Plaintiff's pockets and

---

[8] There is discrepancy between Plaintiff's original interview and his complaints as to whether he was restrained while standing or on his knees. However, this point is moot, as his primary allegation of excessive force is not being put on his knees, but being held at gunpoint and physically restrained.

Order - 10

socks may not have been necessary to discover a gun on him, as a pat down search was likely sufficient. Yet, a witness had reported that the suspect "appeared to chamber a round in a semi-auto gun" [Libbey Dec., Dkt. 13, at Ex. 4], indicating that he was carrying bullets. A pat down search would likely not discover hidden bullets, and thus checking his socks and pockets was necessary to ensure he was not carrying these "instruments of assault," *Hill*, 545 F.2d at 1193, and was "strictly circumscribed by the exigencies which justify [the search's] initiation." *Terry*, 392 U.S. at 25-26. Further, other weapons such as a knife could be hidden in a pocket or sock and not found with a pat down search. Thus, the search was limited to "measures [taken] to neutralize the risk of physical harm and to determine whether the person in question is armed[9]," *Alvarez*, 899 F.2d at 838.

The Ninth Circuit has held that the use of physical force on a suspect and holding a suspect at gunpoint may be permitted during a *Terry* stop if such are reasonable measures in the circumstances to ensure no one is harmed and the suspect is not armed. *See, e.g., U.S. v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987), *Alvarez*, 899 F.2d at 838. Accepting Mr. Nash's testimony that guns were pointed at him and he was forcefully restrained by the hands and neck while being searched and identified does not invalidate the officers' actions. They were justified in assuming that Mr. Nash was armed with a loaded gun, so threatening deadly force and using physical force to suppress and restrain him were reasonable measures. *See Buffington*, 815 F.2d at 1300. Upon confirming that Plaintiff was not the armed suspect, the guns were re-holstered and he was let go. Overall, the *Terry* stop lasted about five minutes and all actions taken were narrowly tailored to ensuring the officers' safety, checking Mr. Nash for weapons, and confirming his identity.

---

[9] Even if bullets alone do not constitute weapons, their presence would be a very strong and relevant indication that Mr. Nash was the burglary suspect, or at least that he had recently been armed and had access to a gun. Given the circumstances of the ongoing and futile manhunt, checking for bullets would certainly be a reasonable measure in determining if Mr. Nash was the suspect, or in other words it was a valid "additional step[] to investigate further." *Hiibel,* 542 U.S. at 185. More importantly, *Terry* stop officers are permitted to take reasonable steps to ensure not only their own safety, but also the safety of others nearby. *See, e.g., Terry* at 25. Mr. Nash leaving the stop with bullets to load into a nearby gun would certainly pose a threat to people in the area.

Because, taking the evidence in the light most favorable to the Plaintiff, Defendants' suspicion of Mr. Nash and their interactions with him were all reasonable in the circumstances, summary judgment dismissing Plaintiff's Fourth Amendment claims is GRANTED.

### D. Fourteenth Amendment Claims

Plaintiff alleges that he was discriminated against and denied equal protection of the laws because he was (1) searched and seized on the basis of his race and was (2) given an "unimpartial" VPD investigation on the basis of his sex offender status. The first allegation fails because race was only one of a handful of reasons for suspecting Mr. Nash, and the second fails because he has provided no evidence of an incomplete or improper investigation into his VPD complaint.

To establish an equal protection violation, Plaintiff must show that Defendants, acting under color of state law, discriminated against him as a member of a protected class and that the discrimination was intentional. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). It is true that "[r]ace or color alone is not a sufficient basis for making an investigatory stop," *U.S. v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (citing *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975)); however, "race can be a relevant factor." *Bautista*, 684 F.2d at 1289. In *Bautista*, for example, the Ninth Circuit upheld an investigatory stop where, in addition to race, the suspect's location was consistent with the escape route. *Id*. As articulated in § II(B)(1) of this Order, Mr. Nash's race was only one of a handful of factors leading to the suspicion of him being the burglary suspect. His attire, location, and demeanor were relevant factors to the suspicion as well. Because, taking the evidence in the light most favorable to the Plaintiff, his race was only one of a handful of relevant factors leading up to the investigatory stop, Plaintiff's race-based equal protection claim fails as a matter of law.

After the *Terry* stop, Mr. Nash filed a complaint with the VPD, for which an Internal Affairs Investigation was conducted by the Department's Professional Standards Unit. Sergeant Libbey interviewed Plaintiff and all officers who were at the scene of the incident, and submitted the investigatory files to Commander Delgado. Delgado assessed the incident, determined that there had been no violation of VPD Policy 470-Preventing Biased Policing or

any other misconduct, and denied Plaintiff's complaint. A proper, thorough, and unbiased investigation into the incident was conducted by the PSU, and Plaintiff's equal protection claim alleging an "unimpartial investigation" will not survive merely because his VPD complaint was denied.

Mr. Nash alleges that Sergeant Libbey provided "false and misleading information" regarding his status of unavailability prior to December 5, 2010 in order to "have [his] complaint denied" because she knew he was a convicted sex offender. [*See* Dkt. #18, Proposed Amended Complaint]. Like his allegation of an "unimpartial investigation," it is unclear what exactly Plaintiff is alleging and upon which evidence he bases this allegation. It is clear from the extensive investigative records compiled in Sgt. Libbey's Declaration [Dkt. #13] that Mr. Nash was interviewed and was provided a thorough and unbiased investigation into his complaint, which was ultimately deemed unfounded. Denial of his complaint does not imply discrimination or unequal protection of the laws, and there is a lack of any sort of evidence showing a connection between his sex offender status and the outcome of the VPD PCU investigation. His complaint was denied because the *Terry* stop was valid. Taking the evidence in the light most favorable to the Plaintiff does not mean he can baldly assert unfounded and unsupported violations of his constitutional rights. *See, e.g., Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). No reasonable fact finder could find that Plaintiff was discriminated against on the basis of his sex offender status, and accordingly this claim fails as a matter of law.

Taking the evidence in the light most favorable to the Plaintiff, no reasonable finder of fact could infer that he was detained solely on the basis of his race, or that he was denied a proper VPD investigation on the basis of his sex offender status. Thus, summary judgment dismissing Plaintiff's Fourteenth Amendment discrimination and equal protection claims is GRANTED.

### E.     Fifth Amendment Claims

Plaintiff claims that his Fifth Amendment right to due process was violated when Defendants, both at the scene of the *Terry* stop and during the PCU investigation, refused to

Order - 13

provide the names and badge numbers of the officers present at the stop. Yet, nothing in the U.S. Constitution grants him the right to obtain such information. If Mr. Nash's claim is construed as a violation of his substantive due process rights, it must allege and prove "the most egregious official conduct," or "government power that is arbitrarily and oppressively exercised." *City of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In other words, the governmental action must "shock the conscience." *Id*.

All officers present at the scene of the stop testified that they did not hear Mr. Nash request their information. Yet, even viewing the situation in the light most favorable to Mr. Nash, i.e. that they all blatantly ignored or refused him, his claim fails. The officers were rushing to continue the search for an armed burglary suspect on the loose. Schools were on lockdown because of the situation. Upon confirming that Plaintiff was not their target, they scrambled back into their cars and immediately left. Ignoring a request to write out at least six names and badge numbers as the officers were leaving to address a much more pressing issue cannot be said to "shock the conscience." In fact, it would be more shocking if the officers had wasted time waiting around and writing out their information with an armed suspect still on the loose.

The VPD officials who conducted and oversaw Mr. Nash's internal affairs investigation also did not provide him with the officers' names and badge numbers. While refusal to give the information may seem unfair to Mr. Nash, it does not constitute "government power that is arbitrarily and oppressively exercised." *Id*. Mr. Nash had no constitutional right to the requested information. For the same reason, Mr. Nash's claim that Sgt. Libbey withheld information regarding whether any other officers were at the stop [*see* Dkt. #18], taken as true, also does not constitute a violation of his Fifth Amendment right to due process.

Taking the evidence in the light most favorable to the Plaintiff, no reasonable finder of fact could determine that the officers' and other VPD officials' refusal to provide information that Mr. Nash had no right to obtain and did not need in order to receive a fair and thorough investigation constitutes "egregious official conduct" so as to violate his right to due process.

Accordingly, summary judgment dismissing Plaintiff's Fifth Amendment due process claims is GRANTED.

### F. Request for ADR

Because all of Plaintiff's claims are dismissed on the merits through summary judgment, his Request/Motion for Alternative Dispute Resolution [Dkt. #15] is DENIED as moot.

## CONCLUSION

Defendants' Motion for Summary Judgment [Dkt. #12] is GRANTED, and Plaintiff's claims against all Defendants are DISMISSED with prejudice. Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment [Dkt. #17] is DENIED. Plaintiff's Motion for Leave to Amend Complaint [Dkt. #18] is DENIED. Plaintiff's Request/Motion for Alternative Dispute Resolution [Dkt. #15] is DENIED.

**IT IS SO ORDERED.**

Dated this 8th day of July, 2010.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE